## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DAD'S PLACE OF BRYAN OHIO,

        Plaintiff,

    v.

CITY OF BRYAN; MAYOR CARRIE
SCHLADE, *in her official and personal
capacities*; JAMIE MENDEZ, *in his official and
personal capacities*; ANDREW J. WATERSON,
*in his official and personal capacities*, DOUG
POOL, *in his official and personal capacities*,

        Defendants.

Hon._____

Case No. _____

**VERIFIED COMPLAINT WITH
JURY DEMAND**

## INTRODUCTION

1.    The City of Bryan and its officials want to shut down the religious activities

of Dad's Place of Bryan, Ohio, a Christian church that ministers to the homeless by

providing them with food and shelter. In March 2023, Dad's Place began operating its

ministry 24 hours a day to serve the most vulnerable in its community. For months, the

Church engaged in this ministry without incident. However, in November 2023 as winter

began in Northern Ohio, the City issued an ultimatum to the Church: cease operating 24

hours a day or face legal penalties. After Dad's Place refused to force those within its

care out onto the streets, the City began engaging in a campaign to harass, intimidate,

1

and shut down Dad's Place.  To date, the City criminally charged the Church's pastor, threatened to criminally charge the Church's landlord, used law enforcement officials to needlessly harass and humiliate the Church and its congregants, and is threatening to take additional actions to permanently shut down the Church.

2.     Defendants' targeted use of zoning codes and city ordinances against the Church cannot withstand scrutiny under the Constitution, laws of the United States, and the laws of the state of Ohio.

3.     The actions of the City and its officials violate the Church's rights under the Free Exercise Clause and Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Fair Housing Act ("FHA"), and the Rights of Conscience clause of the Ohio Constitution.  Those actions discriminate against the Church on the basis of religion, advance no compelling government interest, and are far from the least restrictive means of advancing the City's purported—albeit pretextual—goals.

4.     The Church accordingly seeks equitable relief and damages to prevent the City from violating its fundamental rights to pursue its religious outreach to some of the most vulnerable members of its community.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

6.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.  This Court has authority to issue the relief sought pursuant to 28 U.S.C. §§ 1343(a), 2201, and 2202 and 42 U.S.C. §§ 1988 and 3613.

8.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).  All Defendants maintain offices and perform their official duties in this district, a substantial part of the events giving rise to the claims occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## PARTIES

9.  Plaintiff Dad's Place is an unincorporated religious organization.  Its principal location is 226 Rear S. Main Street, Bryan, Ohio 43506, where it operates as a church.  Dad's Place has the capacity to file suit on behalf of itself and its members pursuant to Federal Rule of Civil Procedure 17(b).

10.  Defendant City of Bryan ("City" or "Bryan") is an incorporated community in Williams County, Ohio.  The City maintains an office at 1399 E. High St, Bryan, Ohio 43506.

3

11.     Defendant Carrie Schlade is mayor of Bryan.

12.     Defendant Jamie Mendez is a captain for the Bryan Police Department.

13.     Defendant Andrew J. Waterson is a Planning and Zoning Administrator for Bryan.

14.     Defendant Doug Pool is the Fire Chief of Bryan.

## FACTS

**A.     Pastor Avell opens Dad's Place to be a church that welcomes all people.**

15.     Dad's Place is a Christian church located in Bryan, Ohio, that has been serving its community since it opened its doors in 2018.  Christopher Avell is the pastor.

16.     Over the past 5 years, Dad's Place has ministered to hundreds of members of its community, focusing specifically on ministering to the hurting, marginalized, and outcasts living in and around Bryan.

17.      Dad's Place strives to be a church that welcomes all people no matter their walks of life in order to meet their spiritual and physical needs.

18.     The Church's ministry model consists of three phases: 1) Save, 2) Sharpen, and 3) Send.

19.     The Church's first and primary goal is to save the souls of its members by showing them the love and Jesus Christ and teaching them to believe in Him and publicly confess that belief.[1]  As a means of accomplishing this primary goal of meeting people's

---

[1] *See* Romans 10:9.

4

spiritual needs, the Church also works to meet the physical needs of its members, including providing food, shelter, and a community for anyone who walks through its doors.   The Church also works with connecting its members to various other organizations in the community based on the needs of a particular member.

20.     Dad's Place also strives to sharpen its members to not only make them better Christians, but also better citizens and members of their communities.  It believes that living together in a Christian community "sharpens" each member in the same way that iron sharpens iron.[2]

21.     Finally, once its members have obtained sufficient spiritual maturity and ability to function independently, Dad's Place believes it has an obligation to send those members out into their communities to be a blessing to others.  In doing so, the Church models the way Jesus sent His disciples into the world.[3]

22.     Dad's Place resides within a structure encompassing both 226 Rear S. Main Street, Bryan, Ohio 43506 and 216 S. Main Street, Bryan, Ohio 43506 (the "Property"). While these two addresses were at one time separated by a firewall, that firewall was removed years prior to the Church's occupancy, thereby creating one contiguous building.

---

[2] *See* Proverbs 21:17.
[3] *See* John 20:21.

23.     Before Dad's Place resided at the Property, it was previously occupied by another church.  The minister of this previous tenant of the Property resided at the Property while operating the Church's ministry.  Upon information and belief, the City never objected to the minister's use of the Property for residential purposes.

24.     The Property is situated within the City's C-3, Central Business zoning district.

25.     It is located next door to The Sanctuary Homeless Shelter of Williams County (the "Sanctuary"), a Christian homeless shelter that provides apartment housing to the homeless in its community.

26.     It is also located across the street from Sarah's Friends, a non-profit organization that provides support to victims of domestic abuse and other crimes in Williams County.  Such support includes providing transitional housing to those in need of a temporary place to stay.

27.     The Property is also next to an apartment that the Church's landlord owns and regularly leased for residential purposes.

28.     The City's zoning ordinances allow for professional offices, banks, retail and personal service businesses, taverns, and restaurants to operate as a matter of right within the C-3 Zone.  They also allow for residential use as long as the residences are located above the first floor of a building.  If a church wishes to operate within a C-3 zone, the City requires the church to obtain a conditional use permit.

6

29.     At the time Dad's Place began operating at the Property, the back half of Property, located at 226 Rear S. Main Street, had previously obtained approval from the state of Ohio to operate for A-3 occupancy purposes, which includes use as a religious place of worship.

**B.    The City attempts to drive religious institutions from its Central Business zoning district.**

30.     For the first two years of its existence, Dad's Place utilized its entire building to advance its religious mission free from any interference from the City.

31.     However, in 2020, the City's treatment of religious entities in its downtown square drastically shifted as it began a coordinated effort to exclude ministries from operating downtown.

32.     Part of this effort involved targeting the Sanctuary, a ministry that had been operating in the downtown square for almost thirty years.  Until 2020, the City's practice had been to provide police support to the Sanctuary if it ever housed an unruly guest who refused to leave when asked to do so.

33.     However, the City suddenly changed this practice without warning and refused to continue providing police support, knowing that its refusal to do so would put the Sanctuary in a dire financial state if it were forced to go through civil eviction proceedings every time it asked someone to leave.   A letter dated October 19, 2020 from the City's attorney stating the City's position is attached hereto as Exhibit 1.

34.     The City's actions threatened the continued existence of the Sanctuary and left it scrambling to find a solution.  Board minutes for the Sanctuary from November 2020 reflect the Sanctuary's efforts to resolve the problem caused by the City.  A true and correct copy of these minutes are attached hereto as Exhibit 2.

35.     Fortunately, the City's efforts to drive out the Sanctuary failed when the Williams County Sherriff's Department agreed to fill the gap left by the City.

36.     Additionally, the City began strictly enforcing its zoning laws against churches in the downtown square to stifle religious exercise.

37.     City officials contacted both Dad's Place and another church called the Revival Hub Church, which was operating a couple of blocks away from Dad's Place at 108 W. High St, Bryan, OH 43506, to inform them that they were violating the City's zoning ordinances by operating churches in a C-3 zone without obtaining a conditional use permit.

38.     Interpreting the City's enforcement to be against the front half of the Property since the back half had already obtained approval by the State of Ohio to operate as a religious assembly, Dad's Place applied for a conditional use permit to allow it to operate the front half of the Property for religious purposes.

39.     At a Bryan Planning Commission meeting on November 2, 2020, the City considered the Church's application.[4]

---

[4] https://www.youtube.com/watch?v=CNwar6zqdzw&t=2610s.

40.     Even though the Church had been operating for years at the back half of the Property, the Planning Commission insisted that the Church was in violation of the City's zoning ordinances and was required to obtain a conditional use permit to use any portion of the Property for religious purposes.  The Commission therefore denied the application for a conditional use permit with the understanding that Dad's Place could reapply for a conditional use permit for the back half of the Property once it had been inspected for compliance with the City's fire code.

41.     That same night, the City denied a conditional use permit from the Revival Hub Church.  As a result of the City's denial, Revival Hub was forced to cease its operations in Bryan and relocate to Holiday City, Ohio.

42.     Wishing to be a good neighbor and cooperate with the City, Dad's Place allowed City officials to inspect the Property to ensure compliance with all fire and safety laws.

43.     After inspecting the Property, City officials agreed that the back half of the Property complied with all applicable fire and safety laws for use as a religious place of worship.

44.     However, City officials also informed Dad's Place that the City would not allow Dad's Place to operate the front half of its Property for any purpose other than those permitted as a matter of right by the City's C-3 zoning ordinance.

9

45.     Thus, even though it felt a religious calling to use the entire Property to further its ministry, the Church ceased its religious activities in the front half of the Property and applied for a new conditional use permit for the back half of the Property.

46.     Because it no longer had any cognizable basis to deny the Church's application, the City's Planning Commission voted unanimously in favor of the Church's new conditional use permit for the back half of the property on December 7, 2020.[5]

47.     The City Council subsequently voted to approve the Church's conditional use permit on December 21, 2020.[6]

48.     To date, the City is forcing the Church to operate a retail business out of the front half of the Property because of the City's zoning ordinances.

**C.     Dad's Place begins operating its ministry 24 hours a day.**

49.      In March 2023, after a great deal of thought and prayer, Dad's Place decided to open its doors to its community 24 hours a day, 7 days a week.

50.     The Church's religious mission in operating in this manner is to provide a place for people to go who have nowhere else to go and no one to care for them.  In doing so, the Church seeks to live out what it believes is the commandment from Jesus in Matthew 25 to provide food, water, clean clothes, and shelter to those who need it most.

---

[5] https://www.youtube.com/watch?v=WsKgBQaHw1U.
[6] https://www.youtube.com/watch?v=obuMhyXBX90&list=PLJGZMm2eZGogSzNfEjnpU-5zC1xDcAQRT&index=161.

51.     The church made the decision to never close its doors to the public in part based on the severe housing shortage facing Bryan and the surrounding communities in the area.[7]

52.     The Church does not intend to be a permanent residence for anyone in its community, but rather to offer a warm, safe place for people, including the homeless, to rest, recover, and worship as they attempt to find permanent housing.  Thus, the Church operates as an emergency shelter for anyone in need of a temporary place to stay.

53.     While at Dad's Place, the Church works to meet both the spiritual and physical needs of its flock.  To this end, the Church hosts multiple Bible classes, worship services, prayer gathering, and scripture readings each week.  The Church also regularly hosts meals for its members and guest and at one time had laundry facilities available for anyone in its community wishing to use them.

54.     Additionally, the Church allows anyone wishing to stay overnight at the Property to do so.  The Church's policy on staying overnight is simple: the Church's doors are always open, and it will not ask anyone to leave unless there is a biblically valid reason for doing so or if someone at the property poses a danger to himself or others at the Church.

---

[7]Caylee Kirby, *City leaders, port authority looking to help solve Williams County housing shortage*, WTOL11 (June 14, 2023), https://www.wtol.com/article/news/local/williams-county-housing-shortage-leaders-solution/512-a341c3ea-fd04-46af-a7b4-1590b88d67bb#:~:text=number%20of%20houses.-,There%20are%20four%20new%20homes%20in%20the%20county%20that%20are,probably%20short%20200%20houses%20here.

55.     From 11pm to 8am each night (excluding nights where there is a special late-night church event), the Church operates its, "Rest and Refresh in the Lord" ministry. During this time, the Church dims its lights and plays the reading of Scripture over its speakers to invite its members and visitors to rest, pray, listen, or meditate on Scripture. People are free to come and go as they please during this time of rest.

56.     To facilitate this ministry, two volunteers from the Church stay at the Property overnight to ensure the safety of everyone at the Property and to assist with any physical or spiritual needs a member might encounter during the night.

57.     Since opening its doors 24 hours a day, the Church has cared for dozens of members of its community, helping them to not only meet their physical needs, including assisting them with finding critical services (including permanent housing), but also to know the love of Jesus Christ.

58.     An average of 8 people stay at the Church each night, with that number increasing to around 12 people during emergencies such as extreme weather.

59.     The Church considers each of the people who stay onsite to be part of its family within the body of Christ.

60.     Many of the people who stay within the Church overnight suffer from various physical and mental disabilities, including bipolar disorder, schizophrenia, reactive detachment disorder, diabetes, end stage renal disease, depression, anxiety,

Barrett's esophagus, and hiatal hernia.  Additionally, one person staying within the church is confined to a wheelchair.

61.     Others are recovering from drug and alcohol abuse.  The Church works with these individuals to obtain the help they need both to overcome their addiction and to find the freedom that only comes from a relationship with Jesus Christ.

62.     As was the case before the Church opened its doors 24 hours a day, the Church continues partnering with the Bryan police and allows the police to bring in anyone they encounter in the community in need of a temporary place to stay.

63.     The Church's operating hours also enabled it to partner with the Sanctuary to take in people temporarily that the Sanctuary is forced to turn away because its temporary housing is full.

64.     The Church has also welcomed individuals who were unable to meet the qualifications for staying at Sarah's Friends.

65.     Since initiating its 24-hour ministry, the Church has rarely asked anyone to leave who has come to the Church for assistance and shelter.  Indeed, on the rare occasion the Church has done so, is has been for people who the Church has accepted from the police as a ministry to its community.

**D.    The City attempts to halt the Church's ministry.**

66.    On November 3, 2023, Dad's Place received a cease-and-desist letter from Mr. Waterson on behalf of the City ordering the Church to "cease use of housing people with ten (10) days).  A true and correct copy of this letter is attached hereto as Exhibit 3.

67.    The letter went on to state that housing people within the Church constituted an unlawful use of the Property because it was located in a C-3 zone, where residential use is not permitted on the first floor.

68.    The letter further threatened that failing to comply with the letter's demand would result in criminal misdemeanor charges being filed by the City.  Such charges would carry a penalty of $100–$500, up to six months in jail, or both.  Additionally, City stated it would consider each day of continued operation to constitute a separate criminal offense.

69.    Bewildered by the City's letter, the Church immediately reached out to City officials to inquire how it might continue operating its ministry in compliance with the City's zoning laws.

70.    Pastor Avell called Mr. Waterson to discuss how the Church might proceed with its ministry.  Mr. Waterson stated the Church could seek a zoning variance or conditional use permit but that the City would deny such requests.

14

71.     Pastor Avell also reached out to Mayor Schlade on multiple occasions to discuss how the Church could comply with both its religious calling and the City's laws, but the Mayor never answered or returned his calls.

72.     The Church also sought guidance from the City regarding any limits on the length of time people might stay at the Church that the City would allow.  In response to this inquiry, Captain Mendez told the Church to "quit playing games" and to get the people residing in the Church out.

73.     The City met twice with the Church's landlord regarding its November 3, 2023 letter.  The City refused to allow the Church to be present at or in any way participate in those meetings.

74.     On November 17, 2023, City officials, including Fire Chief Doug Pool, City Engineer Brian Wieland, and Captain Mendez, showed up to the Property demanding to perform an inspection of the Property.  Wishing to be a good neighbor and to cooperate with the City as much as possible, the Church allowed the City to inspect the Property.

75.     During the inspection, Chief Pool did not raise any concerns with people spending the night in the Church from a fire safety standpoint.  Indeed, he acknowledged that an interior room in the Church complied with the fire code's requirements for residential use.

76.     During the inspection, Captain Mendez questioned various congregants in the building, investigating details such as their names, dates of birth, where they were from, and how they came to be at the Church.

77.     In response to these questions, one woman at the congregation stated she came to the church after the Bryan Police Department recommended for her to come to the Church.

78.     Upon completion of the inspection, the City conceded that the overwhelming majority of violations found involved issues common to any building as old as the Property.  Upon having such violations brought to its attention by the City, the Church worked diligently to resolve those violations.

79.     Additionally, Chief Pool wrote a letter to Police Chief Greg Ruskey recommending that criminal charges be filed against Pastor Avell for the Church's alleged violations of the City's zoning ordinance.  A true and correct copy of Chief Pool's letter is attached hereto as Exhibit 4.

80.     The letter noted encounters with the following people within the Church: (1) a woman sleeping in a chair; (2) an older man mentioning the existence of a bedroom in the Church; (3) a young man who entered the Church and subsequently fell asleep in a chair; (4) a young woman referring to a room as a bedroom; and (5) a young man making a sandwich who then brought the sandwich to another woman in the Church. Ex. 4.

81.     After considering the City's demands to cease its 24-hour ministry, the Church concluded doing so would be directly contrary to its religious obligation to care for "the least of these" in its community. It therefore continued to keep its doors open 24 hours a day.

82.     On December 8, 2023, the City filed 18 separate criminal charges against Pastor Avell for the work he performed on behalf of the Church. The Complaints list Captain Mendez as the complainant. A true and correct copy of one of the Complaints is attached hereto as Exhibit 5.

83.     Each Complaint accused Pastor Avell of "allow[ing] transients/homeless to reside within the [Property] for an extended amount of time." Ex. 5. It also stated that Pastor Avell allowed people to "eat, wash clothes, and sleep" at the Property despite its C-3 zoning designation.

84.     The City did not properly serve Pastor Avell with any of these Complaints upon filing them. Instead, he discovered the existence of these charges because of a story in the Bryan newspaper. A true and correct copy of that story is attached hereto as Exhibit 6.

85.     Pastor Avell's arraignment was initially set for January 4, 2024.

86.     Counsel for the Church was retained on or around December 26, 2023. Thereafter, counsel contacted the City's counsel to negotiate an extension of Pastor Avell's arraignment and waiving service requirements.

17

87. Counsel for the City refused to agree to any kind of extension of the arraignment, even to allow for time to process pro hac vice applications, and repeatedly attempted to pressure Pastor Avell to appear for his arraignment without the presence of legal counsel.

88. Despite the City's objections, Pastor Avell's arraignment was continued until January 11, 2024.

89. Further, instead of accepting the offer to waive service of process for the criminal charges, the City personally served Pastor Avell on Sunday, December 31, 2023 in front of the Church's congregants as Pastor Avell was preparing to enter the building to conduct Sunday morning services.

90. In the weeks since serving Pastor Avell, the City has repeatedly attempted to harass and intimidate the Church. On multiple occasions, police have visited the Property under false pretenses, including claims that the Church's congregants were panhandling or using illicit drugs. On another occasion, two members of the City's fire department and a police officer visited the Property and demanded entry because of the Property's front door being locked and the public view into the Property being obstructed.

91. The City has also continued to move the goalposts regarding the remedies necessary for the Church to satisfy the City's fire codes.

92.     For example, the City ordered the Church to install a hood over the stove in its kitchen.  After the Church complied and installed a hood, the City demanded the Church install a different hood and that it obtain an inspection from the State of Ohio before the City would be satisfied.

93.     Additionally, City officials initially informed the Church that it could satisfy the fire code by keeping its doors unlocked 24 hours a day.  For a church that is open 24-hours a day, seven days a week and, therefore, had no need of locking its doors, this posed no concern for the church at all.  However, the City is now demanding that the Church either remove its locks entirely or install panic hardware on its doors.

94.     City officials also informed the Church that its laundry facilities violated City ordinances.  Even though the Church installed the necessary equipment to come into compliance with the City's codes, the City still refuses to allow the Church to offer laundry facilities to its congregants on site.  Because of the City's actions, the Church has ceased operating its laundry facilities.

95.     The Church is willing to comply with all reasonable and necessary fire and safety regulations to operate its ministry, but City officials are using these laws as a means to harass the Church and interfere with its ministry and are not allowing the Church sufficient time to cure any of the issues the City alleges to exist.

96.     On January 16, 2024, Chief Pool ordered for a notice to be placed on the Church's door threatening additional criminal charges against Pastor Avell if all issues

were not cured within 7 days.  Multiple issues listed in the form require approval from the state of Ohio and cannot feasibly be completed in the short timeline given by the City. Moreover, the notice also alleges that the Church has engaged in an unlawful change of use.  A true and correct copy of the notice is attached hereto as Exhibit 7.

97.     Additionally, the City is now threatening to charge the Church's landlord with criminal charges if the landlord does not evict the Church from the Property, even though the landlord does not participate in the Church's ministry activities beyond renting the Property to the Church.

98.     On January 19, 2024, the City released an inflammatory press release designed to malign and intimidate the church and undermine its ministry.  A true and correct copy of the press release is attached hereto as Exhibit 8.

99.     In the release, the City falsely implied that Dad's Place was a hotbed of criminal activity and fire and safety violations and that its members posed a threat to the community.  It went on to promise the City would take "appropriate action" against the Church on January 23, 2024.

100.    Upon information and belief, the "appropriate action" that the City intends to take against the Church includes the filing of additional criminal charges against Pastor Avell and filing civil claims against the Church with the goal of permanently shutting down the Church's ministry.

101.    Upon information and belief, all adverse actions taken against the Church by the City were done at the direction and under the supervision of Mayor Schlade.

102.    The actions to deprive Plaintiff of constitutional and statutory rights by the City and Defendants Schlade, Mendez, Waterson, and Pool were taken pursuant to a customary policy and practice announced in its ordinances, specifically, City of Bryan Codified Ordinances § 1155.01, *et seq*. and § 1501.01, *et seq*.

103.    At all times relevant to this action, Defendants were acting under the color of state law by exercising the quintessentially governmental power.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**First and Fourteenth Amendments — Free Exercise Clause**

**(42 U.S.C. § 1983)**

104.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

105.    The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits any state action abridging the free exercise of religion.

106.    The Supreme Court has interpreted the Free Exercise Clause to mean that the government may not enact non-neutral and non-generally applicable laws or policies that substantially burden a sincerely held religious belief unless they are narrowly

tailored to a compelling government interest.  Such laws are narrowly tailored only if they are the least restrictive means of achieving the asserted compelling interest.  *Carson v. Makin*, 142 S.Ct. 1987, 1997–98 (2022).

107.    The Supreme Court has held that "government regulations are not neutral and generally applicable … whenever they treat any comparable secular activity more favorably than religious exercise."  *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021).

108.    Moreover, any state action that discriminates on the basis of religion or targets religion for specially disfavored treatment is subject to strict scrutiny and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

109.    Animus towards the free exercise of religion violates the Free Exercise Clause.  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) ("A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that we have 'set aside' such policies without further inquiry."); *Lukumi*, 508 U.S. at 534 ("The Free Exercise Clause protects against governmental hostility which is masked as well as overt.  The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." (internal quotation marks and citation omitted)).

110.    Dad's Place believes it has a religious obligation to operate its religious ministry 24 hours a day.  In doing so, it seeks to provide a place for people to go who have nowhere else to go and no one to care for them.

111.    Defendants' application of the City's ordinances violates Plaintiffs' right to the free exercise of religion in at least two ways.

112.    *First*, Defendants' conduct constitutes a state action substantially burdening Plaintiff's religious exercise that is neither generally applicable nor neutral.

113.    Defendants' application of the City's ordinances substantially burdens Plaintiffs' free exercise of religion by preventing the Church from using half the Property to conduct its religious ministry and by preventing the Church from following its religious calling to operate its ministry 24 hours a day to care for those in its community with nowhere else to go.

114.    Defendants' actions are not generally applicable because Defendants do not impose similar restrictions upon comparable structures and entities located in the same geographic area.  Indeed, both the Sanctuary and Sarah's Friends provide transient housing and are not facing similar adverse action from the City.  Further, the City's ordinances allow for residential use to occur on the second-floor level of buildings in the City's C-3 zone.

115.    Defendants' actions are also not neutral because the City's actions are motivated by hostility to the Church's religious mission and single out the Church for disparate treatment.

116.    The City does not have a compelling interest in preventing the Church from using the entirety of the Property for religious purposes.  Nor does the City have a compelling interest in preventing the Church from operating 24 hours a day.

117.    Even assuming Defendants' purported interests constitute a compelling government interest, forbidding the Church from using half of the Property and forcing the Church to close its doors at night to the most vulnerable in its community, is not the least restrictive means of achieving that interest.

118.    *Second*, Defendants' conduct targets Plaintiffs due to religious animus and fails to satisfy strict scrutiny.

119.    Defendants' actions demonstrate the City's hostility to the presence of any religious ministry in the City's downtown area.

120.    The City has already shut down one church's operations in its downtown in 2020, and it attempted to either shut down or limit the operations of both Dad's Place and the Sanctuary around the same time.

121.    Further, the City's repeated efforts to harass and intimidate the Church into ceasing its religious ministry demonstrate the City's hostility to the Church's ministry. Since ordering the Church to shut its doors at night in November 2023, the City has: (1)

charged Pastor Avell with 18 criminal charges for violating the City's zoning ordinances; (2) served Pastor Avell with his criminal charges on Sunday morning in front of his congregation in an effort to humiliate Pastor Avell; (3) used the threat of criminal charges to pressure the Church's landlord into evicting the Church; (4) repeatedly visited the Property with law enforcement officials for unjustified reasons in an effort to intimidate the Church and its members and (5) threatened to file additional criminal charges and civil claims against the Church for operating its ministry.

122.    The U.S. Supreme Court has held that any state action that creates "even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices" must be "set aside." *Lukumi*, 508 U.S. at 547.

123.    Here, much more than a slight suspicion exists that the City's actions are motivated by animosity towards the Church's ministry to the most vulnerable in the City. It must therefore be "set aside . . . without further inquiry." *Kennedy*, 142 S. Ct. at 2422 n.1.

124.    Defendants' conduct is motivated by "evil motive or intent" or, at a minimum, involved "reckless or callous indifference" to the Church's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

125.    As a direct and proximate result of Defendants' conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its

constitutional rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

**SECOND CAUSE OF ACTION**

**First and Fourteenth Amendments — Establishment Clause**

**(42 U.S.C. § 1983)**

126.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

127.    The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, restricts "law[s] respecting an establishment of religion." U.S. Const. amend. I.

128.    As part of its restriction on the official establishment of religions, the Constitution necessarily prohibits states from meddling in the internal affairs of houses of worship.  Whether the discrete issue is personnel and hiring matters, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049 (2020), disputes over church property, *Jones v. Wolf,* 443 U.S. 595 (1979), or policing the boundary between orthodoxy and heresy, *Watson v. Jones*, 80 U.S. (16 Wall.) 679 (1872), houses of worship are autonomous within their sphere.

129.    The City's application of its ordinances implicates the very core of a religious group's activities—worship and religious activities on church property.  A church's authority over who may enter the sanctuary, under what circumstances—

26

including at what time of day—and as to where on church property religious activities may take place lies at the very heart of "the general principle of church autonomy" protected by the Establishment Clause. *Our Lady of Guadalupe*, 140 S. Ct. at 2061.

130.    Accordingly, absent a longstanding historical tradition of restrictions on church operating hours like the City's, S51001 is plainly unconstitutional. *See Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2427-28 (2022) (instructing that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings'" and collecting cases).

131.    No history or tradition justifies the City's intrusion into the Church's inner sanctum to dictate which rooms may be used for religious purposes, how the church may go about accomplishing its religious mission, or at what hours of the day religious activities are permitted.

132.    More generally, the Establishment Clause prohibits governmental hostility to religion.

133.    The use of ordinances in furtherance of a plan conceived in religious animus is the sort of "removal … [that] would be seen by many not as a neutral act but as the manifestation of 'a hostility toward religion that has no place in our Establishment Clause traditions.'" *Am. Legion v. Am.n Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019) (quoting *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J., concurring in judgment)).

134.    Defendants' pretextual application of the City's ordinances due to their hostility to Plaintiffs' religion constitutes hostility to religion in violation of the Establishment Clause.

135.    Defendants' conduct is motivated by "evil motive or intent" or, at a minimum, involved "reckless or callous indifference" to the Church's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

136.    As a direct and proximate result of Defendants' conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

## THIRD CAUSE OF ACTION

### Fourteenth Amendment — Equal Protection

### (42 U.S.C. § 1983)

137.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

138.    The Equal Protection Clause of the Fourteenth Amendment forbids state action that discriminates on the basis of religion.

139.    State action violates the Equal Protection Clause when it treats a party differently from similarly situated parties based on a protected characteristic of the

disfavored party, such as religion, and is not narrowly tailored to achieving a compelling government interest.

140.    Defendants' application of the City's ordinances discriminates against the Church based on its religious beliefs.

141.    Defendants permit the operation of a homeless shelter next to the Church along with other residential uses on the second floor of buildings in the City's C-3 zone. The City also allows the operation of other secular entities, including restaurants, non-profits, and retail stores without similar disparate treatment by the City.

142.    Targeting the Property housing the Church's religious activities in this manner is a denial of equal protection of the law. Defendants have treated and are treating Church worse than similarly situated entities, in a manner demonstrating intent to discriminate against Plaintiffs' use of Property for religious purposes.

143.    For the reasons set forth above, Defendants' discriminatory treatment of Plaintiffs neither serves any compelling governmental interest nor is the least restrictive means of achieving Defendants' purported ends.

144.    Defendants' conduct is motivated by "evil motive or intent" or, at a minimum, involved "reckless or callous indifference" to the Church's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

145.    As a direct and proximate result of Defendants' conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its

constitutional rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

## FOURTH CAUSE OF ACTION

**Religious Land Use and Institutionalized Persons Act — Substantial Burden**

**(42 U.S.C. § 2000cc(a))**

146.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

147.    Under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the government may not "impose or implement a land use regulation in a manner that imposes a substantial burden" on religious exercise — unless it shows that imposing that burden is the "least restrictive means" of furthering a "compelling" interest. 42 U.S.C. § 2000cc(a)(1).

148.    Defendants' ordinances constitute land use regulations under RLUIPA.

149.    For purposes of RLUIPA, Defendants burdened the Church's religious exercise by imposing or implementing a "land use regulation" that involved "individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). In deciding to limit the Church's use of the Property, Defendants made individualized assessments regarding the Church's use of the Property.

150.    Defendants' application of the City's ordinances substantially burdens Plaintiffs' free exercise of religion by preventing the Church from using half the Property

30

to conduct its religious ministry and by preventing the Church from following its religious calling to operate its ministry 24 hours a day in order to care for those in its community with nowhere else to go.

151.    The substantial burden imposed by Defendants' actions will prevent the Church from engaging in activities that will affect interstate and foreign commerce.

152.    The City does not have a compelling interest in preventing the Church from using the entirety of the Property for religious purposes.  Nor does the City have a compelling interest in preventing the Church from operating 24 hours a day.

153.    Even assuming Defendants' purported interests constitute a compelling government interest, forbidding the Church from using half of the Property and forcing the Church to close its doors at night to the most vulnerable in its community, is not the least restrictive means of achieving that interest.

154.    As a direct and proximate result of Defendants' RLUIPA violations, the Church has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

## FIFTH CAUSE OF ACTION

**Religious Land Use and Institutionalized Persons Act — Discrimination**

**(42 U.S.C. § 2000cc(b))**

155.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

156.    Under RLUIPA, the government may not "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2).

157.    Defendants' ordinances constitute land use regulations under RLUIPA.

158.    Defendants' application of the City's ordinances violates RLUIPA because it discriminates against the Church on the basis of its religion and religious practices.

159.    As a direct and proximate result of Defendants' RLUIPA violation, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutorily protected rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

## SIXTH CAUSE OF ACTION

**Religious Land Use and Institutionalized Persons Act — Equal Terms**

**(42 U.S.C. § 2000cc(b))**

160.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

161.    Under RLUIPA, the government may not "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(2).

162.    Defendants' ordinances constitute land use regulations under RLUIPA.

163.    Defendants' application of the City's ordinances violates RLUIPA because it treats the Church on less than equal terms compared to other comparable land uses in the City's C-3 zone, including restaurants, retail businesses, secular non-profits, and residential use on the second floor of buildings in the C-3 zone.

164.    Further, Defendants' application of the City's ordinances is less than equal than Defendants' treatment of the Sanctuary, another comparable religious entity that operates a homeless shelter next door to the Church.  The same is true of Defendants' treatment of Sarah's Friends, a secular non-profit that provides transient housing.

165.    As a direct and proximate result of Defendants' RLUIPA violation, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutorily protected rights, entitling it to declaratory and injunctive relief, damages, and attorneys' fees.

## SEVENTH CAUSE OF ACTION

## Fair Housing Act — Religious Discrimination

## (42 U.S.C. § 3604)

166.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

167.    The Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

168.    Federal law thus prohibits the City from "[l]imiting the use of privileges, services or facilities associated with a dwelling because of . . . religion . . . [or] [s]ubjecting a person to harassment because of . . . religion . . . that has the effect of . . . denying or limiting services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65(b)(4), (7).

169.    The Church's status as a temporary emergency shelter constitutes a dwelling under the Fair Housing Act.

170.    The City's enforcement of its ordinances constitutes unlawful discrimination against the Church because of its religion.  Specifically, the City is enforcing its ordinances in a manner that discriminates against the Church and its members by seeking to preventing the Church and its members from engaging in

communal worship and other religious activities at the Property in violation of the Fair Housing Act.

171.    Defendants have acted with malice or reckless indifference that their actions might violate the FHA.

172.    As a direct and proximate result of Defendants' FHA violation, the Church and its members have suffered and will continue to suffer irreparable harm, including the loss of their statutorily protected rights, entitling them to declaratory and injunctive relief, damages, and attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Fair Housing Act — Unlawful Interference

### (42 U.S.C. § 3617)

173.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

174.    The Fair Housing Act makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

175.    The Church's status as a temporary emergency shelter constitutes a dwelling under the Fair Housing Act.

176.     The City's enforcement of its ordinances against the Church interferes with the Church and its members' exercise or enjoyment of the rights protected by Section 3604 of the Fair Housing Act.

177.     Defendants have acted with malice or reckless indifference that their actions might violate the FHA.

178.     As a direct and proximate result of Defendants' FHA violation, the Church and its members have suffered and will continue to suffer irreparable harm, including the loss of their statutorily protected rights, entitling them to declaratory and injunctive relief, damages, and attorneys' fees.

## NINTH CAUSE OF ACTION

### Fair Housing Act — Handicap Discrimination

### (42 U.S.C. § 3604)

179.     The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

180.     The Fair Housing Act makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available" or "any person associated with that buyer or renter."

36

181.    The Fair Housing Act is violated by the existence of a disparate impact of a city's practice or policy on handicapped individuals.

182.    The Fair Housing Act is also violated when a city fails to make reasonable accommodations in rules, policies, or practices so as to afford people with disabilities or handicaps an equal opportunity to live in a dwelling.

183.    The Church's status as a temporary emergency shelter constitutes a dwelling under the Fair Housing Act.

184.    The City's enforcement of its ordinances against the Church discriminates against persons residing, intending to reside, or other associated with the Church on the basis of their handicaps.

185.    Multiple people residing, intending to reside, or otherwise associated with the Church possess handicaps as recognized by federal law.  These handicaps include physical and mental disabilities including but not limited to bipolar disorder, schizophrenia, reactive detachment disorder, diabetes, end stage renal disease, depression, anxiety, Barrett's esophagus, hiatal hernia, and drug and alcohol addictions. Additionally, one person residing within the Church is confined to a wheelchair.

186.    The City is aware or should be aware that handicapped individuals are residing within the Church.  City officials have visited the Church on numerous occasions and even questioned many of the individuals staying within the Church.

187.    The City's application of its ordinances will have a disparate impact on the Church's handicapped members and will thereby deprive these handicapped individuals of any housing within the City.

188.    The Church's members are being treated differently than similarly situated groups, including those residing at transient housing located at either the Sanctuary or Sarah's Friends.

189.    The City has an obligation under the FHA to provide the Church with an accommodation for the Church's handicapped members that is reasonable, necessary, and will afford these handicapped individuals equal opportunity to enjoy housing within the City.

190.    By denying the Church the ability to provide temporary housing to these handicapped individuals, the City is violating its obligation to accommodate under the FHA.

191.    The temporary housing provided by the Church is reasonable because the Church is providing a public service to the citizens of Bryan at no cost to the City. Further, other organizations, like the Sanctuary and Sarah's Friends, provide comparable temporary housing to individuals in need.

192.    The temporary housing provided by the Church is necessary because the people it houses have nowhere else in Bryan to stay.

193.    The temporary housing provided by the Church affords its handicapped members an equal opportunity to find a warm, safe, place to reside on a temporary basis within the City.  Without the Church's ministry, these individuals would be deprived of housing within the City.

194.    Defendants have acted with malice or reckless indifference that their actions might violate the FHA.

195.    As a direct and proximate result of Defendants' FHA violations, the Church and its members have suffered and will continue to suffer irreparable harm, including the loss of their statutorily protected rights, entitling them to declaratory and injunctive relief, damages, and attorneys' fees.

## TENTH CAUSE OF ACTION

### Ohio Constitution — Interference with Rights of Conscience

### (Ohio Const. art. I, § 7)

196.    The Church incorporates herein by reference each allegation contained in paragraphs 1 through 103 of this Complaint.

197.    Article I, Section 7 of the Ohio Constitution forbids the government from engaging in any action that "interfere[s] with the rights of conscience."

198.    The Ohio Supreme Court has interpreted this provision to require the application of strict scrutiny for any burden on religious exercise.  *See Humphrey v. Lane*, 728 N.E.2d 1039, 1043 (Ohio 2000).

199.    Thus, any burden imposed on the Church's religious exercise by the City must further a compelling interest by the least restrictive means.

200.    Defendants' application of the City's ordinances substantially burdens Plaintiffs' free exercise of religion by preventing the Church from using half the Property to conduct its religious ministry and by preventing the Church from following its religious calling to operate its ministry 24 hours a day in order to care for those in its community with nowhere else to go.

201.    The substantial burden imposed by Defendants' actions will prevent the Church from engaging in activities that will affect interstate and foreign commerce.

202.    The City does not have a compelling interest in preventing the Church from using the entirety of the Property for religious purposes.  Nor does the City have a compelling interest in preventing the Church from operating 24 hours a day.

203.    Even assuming Defendants' purported interests constitute a compelling government interest, forbidding the Church from using half of the Property and forcing the Church to close its doors at night to the most vulnerable in its community, is not the least restrictive means of achieving that interest.

204.    As a direct and proximate result of Defendants' conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

**PRAYER FOR RELIEF**

Dad's Place respectfully asks the Court to:

1.      Declare that Defendants' application of the City's ordinances against the Church violates Plaintiff's rights under the First and Fourteenth Amendments, under RLUIPA, under the Fair Housing Act, and under the Ohio Constitution;

2.      Enjoin Defendants from taking any further steps to enforce its zoning ordinances against Plaintiff;

3.      Award nominal damages to Plaintiff;

4.      Award actual damages to Plaintiff;

5.      Award punitive damages to Plaintiff;

6.      Award Plaintiff attorney's fees and costs under 42 U.S.C. §§ 1988 and 3613;

7.      Award such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  January 22, 2024          /s/ william stuart dornette

Stephen D. Hartman             W. Stuart Dornette
Spengler Nathanson P.L.L.       Philip D. Williamson
900 Adams St.                  Taft Stettinius & Hollister LLP
Toledo, OH 43604               425 Walnut St., Suite 1800
Ph:  419/690-4604              Cincinnati, OH 45202
Fax:  419/241-8599             (513) 381-2838
Shartman@snlaw.com             dornette@taftlaw.com
                               pwilliamson@taftlaw.com

David J. Hacker*
Jeremy Dys*
Ryan Gardner*                  *Counsel for Plaintiff Dad's Place of Bryan, Ohio*
First Liberty Institute
2001 W. Plano Pkwy., Suite 1600
Plano, TX 75075
(972) 941-4444
jdys@firstliberty.org
rgardner@firstliberty.org

*Admission forthcoming

## <u>VERIFICATION</u>

I, Christopher Avell, am over the age of 18 and am the Pastor for Plaintiff Dad's Place. The allegations set forth in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated). If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on: January 21, 2024

_____
Christopher Avell